UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JAMIE H.,[1]
                                    Plaintiff                    DECISION and
                                                                ORDER

-vs-
                                                                1:20-CV-01272 CJS

COMMISSIONER OF SOCIAL
SECURITY,
                                    Defendant.
_____

INTRODUCTION

        This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or

"Defendant") which denied the application of Plaintiff for Social Security Disability

Insurance ("SSDI") benefits.   Now before the Court is Plaintiff's motion (ECF No.

14) for judgment on the pleadings and Defendant's cross-motion (ECF No. 20) for

the same relief.   For the reasons discussed below, Plaintiff's application is denied

and Defendant's application is granted.

STANDARDS OF LAW

        The Commissioner decides applications for SSDI benefits using a five-step

sequential evaluation:

        A five-step sequential analysis is used to evaluate disability claims.

_____

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that,
"[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42
U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-
government party will be identified and referenced solely by first name and last initial."

> *See* 20 C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment]. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[2] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted)

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

---

[2] Residual functional capacity or RFC "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).   However, not every legal error by an ALJ requires reversal.   Rather, an error may be deemed harmless unless it prejudices the plaintiff by negatively affecting the outcome of the ALJ's decision. See*, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).[3]

---

[3] *See also, Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 9 (2d Cir. 2017) ("[W]e agree that any such error was harmless, since Monroe has not identified any prejudice and the record establishes that the error did not affect the ALJ's decision."); *Suttles v. Colvin*, 654 F. App'x 44, 47 (2d Cir. 2016) ("[A]ssuming that the Appeals Council erred, there was nevertheless no reasonable possibility that consideration of Dr. Liotta's report would have altered the ALJ's decision, because the evidence that Dr. Liotta adduced was not materially different from that which was already before the ALJ and the vocational expert when they reached their conclusions."); *but compare, Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) ("Dr. Wheeler provided the ALJ with an opinion that Greek . . . would likely be absent from work more than four days per month as a result of his impairments or treatment.   . . .   Because a vocational expert in this case testified that Greek

If the Commissioner applied the correct legal standards, or if any legal error was harmless, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773. Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying the substantial-evidence standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and

---

could perform no jobs available in large numbers in the national economy if he had to miss four or more days of work per month, the ALJ's failure to provide adequate reasons for rejecting Dr. Wheeler's opinion was not harmless.").

whether substantial evidence supports the decision of the Commissioner.")
(citations omitted).

### FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history
of this action.   The Court will refer to the record only as necessary for purposes of
this Decision and Order.

Plaintiff claimed to have become disabled on September 24, 2018, due
primarily to mental impairments including anxiety, depression and post-traumatic
stress disorder ("PTSD"), in addition to various physical impairments such as
obesity, asthma, sleep apnea and diabetes.   Related to her mental impairments,
Plaintiff indicates that as a child she experienced beatings and by her father, and
that as a teenager she was raped by her mother's boyfriend and another man.[4]
The record also indicates that Plaintiff is a daily cigarette smoker and has a history
of abusing methamphetamine and other street drugs.[5]

As of the alleged disability onset date Plaintiff was 41 years of age, had
completed the eleventh grade of high school,[6] and had worked at a variety of
relevant jobs[7] including supermarket cashier, restaurant waitress, retail customer
service manager, donut shop supervisor and quality-control inspector in a food-

---

[4] Tr. 64-65, 72.
[5] Tr. 1198, 1201; ECF No. 14-1 at pp. 9, 12.
[6] Plaintiff received special education classes from the fourth grade onward due to a learning
disability. Tr. 42. The Court recalls seeing in the treatment records that Plaintiff indicated she left
high school because she wanted to begin working.
[7] Performed within the past fifteen years.

processing plant.[8]  The job at the food-processing plant involved two aspects: First, standing and watching cans of beans passing by on a conveyor belt and checking for imperfections in the cans such as dents; and, second, sitting and watching beans that were passing by on a conveyor belt prior to canning and checking for foreign matter mixed in with the vegetables.[9]

Immediately prior to the alleged disability onset date Plaintiff was working as a supermarket cashier.   Plaintiff indicates that she stopped working at that job due to "anxiety, PTSD" and "hearing voices."[10]  Plaintiff indicates that her primary care doctor advised her to stop working and seek mental health treatment.

Plaintiff indicates that she is unable to drive herself places, and that she voluntarily gave up driving following an incident of vertigo, although the record indicates that she can and does still drive herself when necessary. Tr. 93.

As discussed below the medical treatment records generally indicate that Plaintiff has longstanding symptoms of anxiety and depression that have flared up at times, such as when she has been noncompliant with medication and/or when stressful family situations have arisen, while at other times her symptoms have been well controlled.

On November 18, 2013, when Plaintiff was age 37 and residing in Indiana, she sought mental health treatment following the death of her father five months earlier. Tr. 1427.   Plaintiff reported feelings of grief and stress related to the

---

[8] Tr. 42-48.
[9] Tr. 47.
[10] Tr. 49.

administration of her father's estate, and also complained of anxiety and paranoia. Plaintiff indicated that her symptoms had caused her to become aggressive toward co-workers, and that she had not returned to work for a week.   Plaintiff indicated that she did not like to take medications that "make her feel different." Tr. 1427. Plaintiff's physician, Teresa Greiner, M.D. ("Greiner") noted that she had previously prescribed various medications for Plaintiff which Plaintiff had refused to take due to fear of side effects including angioedema (swelling) to which she was prone. Tr. 1449 (Plaintiff had reported negative side-effects from many previously-tried medications).   Greiner noted that Plaintiff had been receiving mental-health treatment since her early 20s.   Plaintiff reported having a traumatic upbringing by an alcoholic father who was physically abusive.   Plaintiff reported that her parents divorced and that her mother subsequently had various boyfriends, one of whom sexually abused Plaintiff: "Her mom 'went on a wild streak' had lots of boyfriends, one of whom abused Jamie." Tr. 1450, 1446.   Plaintiff also reported being raped by one of her own boyfriends. Tr. 1450 ("She has previously been raped when she was dating when she was under the influence of Ambien sleeping pills."); *see also*, Tr. 1455 ("Jamie reported that she experienced some physical and verbal abuse from her father while growing up.   She also reported that she was sexually abused by former boyfriends and strangers.   She stated she did not want to talk about any of the abuse.").   Greiner's diagnostic impressions were Bipolar Disorder Type II, with Depression and Paranoia, Post Traumatic Stress Disorder and Panic Disorder with Agoraphobia. Tr. 1450.

However, Plaintiff's symptoms improved rapidly with medication and therapy.   On March 5, 2014, Greiner reported that Plaintiff was much better after taking Geodon. Tr. 1469 ("She feels she is doing well on that dose.  . . .  Her mood is good.   She has more energy.   She feels less anxious.   She has been able to drive by herself, go in small stores, just not in big and busy stores."); *see also*, Tr. 1447 ("She responded very well to the Geodon and said it worked very quickly for her.").   Plaintiff's mental status exam was normal. Tr. 1469.   Greiner noted that Plaintiff planned to return to work in a month. Tr. 1470.   By July 2014 Plaintiff had returned to work several days per week and intended to increase to full time. Tr. 1428.   On November 10, 2014, Plaintiff was discharged from treatment, and the discharge note indicated that Plaintiff had stopped taking medication and felt well again. Tr. 1504 ("Client's anxiety is not as high and she has no depression.   Client reported her self esteem has increased and [she] doesn't feel distant from everyone.   Client would like to go back to full-time [employment], eventually.").

Plaintiff subsequently moved from Indiana to New York, and resumed working.   At all relevant times thereafter, Plaintiff resided in the same house with her husband and mother-in-law.   Plaintiff's husband is a truck driver who was away from the home most weekdays and weeknights, leaving Plaintiff alone with her mother-in-law, with whom she has a difficult relationship.   Nevertheless, in 2017 and early-to-mid 2018, Plaintiff was apparently doing well regarding mental health.   For example, on April 12, 2017, Plaintiff's primary care provider, Christa

Zenoski, FNP ("Zenoski"), reported that although Plaintiff carried diagnoses for depression and bipolar disorder, she had "normal" mood, affect, judgment and insight. Tr. 1335; *see also*, Tr. 1311 (Same on March 15, 2018).   On April 16, 2018, Zenoski reported "no memory lapses or loss, no confusion, no nervousness, no depression, no sleep problems and no anxiety." Tr. 1298; *but see,* Tr. 1312 (On or about March 1, 2018, Plaintiff reported waking up in the night with a panic attack.).

In May 2018, approximately four months prior to the alleged disability onset date, Plaintiff went to the emergency room ("ER") complaining of trouble breathing after receiving asthma medication.   Plaintiff also indicated that she had been under a lot of stress.   The attending doctor's impression was stress, anxiety and depression.

On June 26, 2018, Zenoski reported that Plaintiff was "tearful" and complaining of depression, fatigue and general poor health lately. Tr. 1294 (Plaintiff was complaining of pain from umbilical hernia for which she later had surgery).

On September 10, 2018, Plaintiff returned to the ER complaining of symptoms such as left-arm numbness, trouble breathing, stomach pain and anxiety, all of which the attending doctor attributed to a panic attack.

On October 4, 2018, Plaintiff went to Wyoming County Mental Health, Clarity Counseling Center ("Clarity"), complaining of panic attacks and suicidal ideation. Tr. 1702.   Plaintiff indicated that her symptoms had worsened during the

past three weeks, mostly when her husband was away from home while working. Plaintiff indicated that her panic attacks involved "stroke-like symptoms" such as "numbing of the face and arms." Tr. 1702.   Plaintiff indicated that she did not want to take anti-depressant medications because she had experienced bad side-effects from them in the past.   Tr. 1702.   Staff at Clarity recommended that Plaintiff go to the hospital for inpatient treatment.

The following day, October 5, 2018, Plaintiff went to the Wyoming County Hospital ER complaining chiefly of anxiety and panic attacks. Tr. 436.   Plaintiff indicated that she had been experiencing "panic attacks and anxiety for 5 years." Tr. 436.   Plaintiff claimed to feel "hopeless, helpless, worthless," as well as experiencing "paralyzing anxiety" that prevented her from working. Tr. 436. Plaintiff indicated that she did not get along with her mother-in-law, with whom she lived, and felt that the mother-in-law was "part of the problem." Tr. 436.   Plaintiff was admitted for treatment, with a diagnostic impression of "generalized anxiety disorder." Tr. 437.   Upon a subsequent mental status exam, Plaintiff *denied* hopelessness, helplessness, worthlessness, paranoia, suicidal ideation, homicidal ideation or auditory or visual hallucinations. Tr. 437, 439.   During her inpatient stay Plaintiff indicated that she had been experiencing anxiety and "near daily panic attacks," along with headaches, and that she was having "difficulty functioning in daily life because of the anxiety." Tr. 438.   Plaintiff indicated that one factor in her anxiety was that she was afraid she was going to die due to her inability to control her high cholesterol. Tr. 438.   Upon receiving Klonopin,

Plaintiff's symptoms improved rapidly and she asked to be discharged. Tr. 438, 440.[11]

On October 23, 2018, Plaintiff filed the subject application for SSDI benefits. In connection with that application, Plaintiff indicated, *inter alia*, that she had severe agoraphobia and only went outside about once per week to go shopping with her husband, because she was afraid she was going to die. Tr. 334 ("I don't go outside, everything spins and I start panicking.   I don't go [outside] because I am going to die or not make it back home.").

On November 12, 2018, Plaintiff began outpatient mental health treatment through Clarity. Tr. 1174.   At Clarity, Plaintiff saw therapist William Lorenz, MHC ("Lorenz") for counseling and psychiatrist Raja Rao, M.D. ("Rao") for medication management. Tr. 1197, 1709.   On December 7, 2018, Plaintiff told Lorenz that she needed hernia surgery and had hired an attorney to file for SSDI benefits. Tr. 1197.   Plaintiff complained of auditory hallucinations. Tr. 1197.   Plaintiff reported having difficulties dealing with her mother-in-law and with her drug-addicted sister. Tr. 1197.   Lorenz observed that Plaintiff cried intermittently throughout the session but "seemed more at ease by session's end." Tr. 1197.

On December 13, 2018, Rao performed an Initial Psychiatric Assessment lasting 45 minutes. Tr. 1709.   Plaintiff told Rao that she had past diagnoses of anxiety, bipolar disorder, PTSD, agoraphobia and depression, for which she had

---

[11] Plaintiff later told the ALJ that she had not really improved, but merely said that so that she could return home and be with her pets.

taken many different medications, most of which gave her bad side effects. Tr. 1709.   Plaintiff indicated that she was having difficulty leaving her home due to anxiety, mood swings and agoraphobia. Tr. 1710.   Plaintiff reported having "a lot of flashbacks related to abuse she went through by her father and later on sexual abuse." Tr. 1709.   Rao reported that Plaintiff's mental status exam results were largely normal except for severe anxious and depressed mood. Tr. 1710.   Rao indicated that his primary diagnosis was PTSD with mood swings, and that Plaintiff's symptoms were related to PTSD as opposed to bipolar disorder. Tr. 1711.   Rao prescribed Klonopin and Hydroxyzine and recommended that Plaintiff continue working with Lorenz, "who w[ould] work with her to overcome her past." Tr. 1711.

On January 15, 2019, Rao saw Plaintiff for a medication management appointment lasting 23 minutes. Tr. 1209.   Plaintiff indicated that she had received surgery to repair her hernia.   Regarding mental symptoms, Plaintiff reported experiencing a "cracking sound" in her head after her husband became irritable or angry, which was similar to what she had experienced when her father would become angry. Tr. 1209-1210.   Plaintiff reported ongoing difficulties living with her mother-in-law, and indicated that she and her husband were considering moving to a different house to get away from the mother-in-law. Tr. 1210.   Plaintiff indicated that she was taking Klonopin, though less than what Rao had prescribed because it made her feel sleepy. Tr. 1209.   Rao consequently reduced the prescribed amount of Klonopin. Tr. 1210.   Rao indicated that Plaintiff's mental

status was essentially normal except for "mild to moderate" depressed and tearful mood. Tr. 1210.   Rao told Plaintiff that "a lot of her issues" seemed "situational" and that she should try to work through them with her husband and mother-in-law: "I encouraged a lot of her issues are situational with her mother-in-law and she should continue to work with the therapist and hopefully involve her husband, which might resolve the conflict." Tr. 1210.

On January 24, 2019, psychologist Janine Ippolito, Psy.D. ("Ippolito") performed a psychiatric evaluation of Plaintiff at the Commissioner's request. Tr. 1150-1158.   Plaintiff told Ippolito that she had last worked as a cashier for two years but had stopped working in September 2018 due to mental health problems. Tr. 1150.   Plaintiff indicated that she had four prior psychiatric hospitalizations and carried diagnoses for "suicidal disorder, PTSD, and anxiety, though Ippolito noted that Plaintiff's most-recent diagnosis had been generalized anxiety disorder. Tr. 1150.   Plaintiff indicated a long history of depression, that had worsened when her father died, passive suicidal ideation, and anxiety that "typically" caused her to avoid leaving her home. Tr. 1151.   Plaintiff also claimed to have bipolar disorder characterized by brief periods of manic energy.   Plaintiff indicated that she performed all of her own activities of daily living and household chores. Tr. 1152. Plaintiff stated that she spent her time caring for her dogs and talking on the phone with family members. Tr. 1152.   Upon examination Ippolito reported essentially normal findings except that Plaintiff claimed to feel "stressed out" and her memory appeared impaired due to anxiety and nervousness. Tr. 1152.   Ippolito's medical

13

source statement was as follows:

> The claimant presents as able to understand, remember and apply simple and complex directions and instructions, maintain personal hygiene and appropriate attire, and demonstrate awareness of normal hazards and taking appropriate precautions with no evidence of limitation.   She can sustain concentration and perform a task at a consistent pace with mild limitations.   She can use reason and judgment to make work related decisions, interact adequately with supervisors, coworkers and the public, and sustain an ordinary routine and regular attendance at work with moderate limitations. She can regulate emotions, control behavior and maintain well being with marked limitations.   These limitations are due to emotional distress.   The results of the present evaluation appear to be consistent with psychiatric problems and this may significantly interfere with the claimant's ability to function on a daily basis.

Tr. 1153.   Ippolito indicated that Plaintiff's prognosis was "fair to guarded." Tr. 1153.

On February 8, 2019, Lorenz reported that Plaintiff was continuing to complain about her living situation with her mother-in-law. Tr. 1220.   However, Lorenz indicated that Plaintiff was "relaxed and in good spirits" and had been "able to let go of a lot that was bothering her." Tr. 1220.

On February 15, 2019, Lorenz reported that Plaintiff was "overall doing ok" and "felt comfortable in her own skin," though she had been staying at her sister-in-law's house because both her husband and mother-in-law were away and she did not want to be at home alone. Tr. 1222.   Plaintiff indicated that she got along fine with her sister-in-law. Tr. 1222.   Plaintiff stated that she and her husband were continuing to talk about buying a house. Tr. 1222.   Lorenz stated that Plaintiff

seemed tired but relaxed and in good spirits. Tr. 1222.

On February 22, 2019, agency review physician S. Juriga ("Juriga") indicated, in connection with Plaintiff's application for SSDI benefits, that Plaintiff was capable of performing "simple work" that required only "low contact" with other people. Tr. 1161-1163.   In that regard, disability analyst D. Szymanski ("Szymanski") submitted to Juriga an "electronic request for medical advice" in which Szymanski discussed the medical evidence of record ("MER") accumulated to that date concerning Plaintiff's mental impairments, including the evaluation by Ippolito. Tr. 1161-1162.   Szymanski noted several instances in which Plaintiff's subjective complaints seemed inconsistent with the MER, such as her claim of daily panic attacks. *See*, Tr. 1161 (Observing that treatment records indicated that Plaintiff was complaining of anxiety and depression but not panic attacks); *see also, id*. ("She reported near daily panic attacks with is not indicated in MER."); *id*. ("Reports issues with concentration and [claims that she] cannot finish what she starts but was able to complete ADLs fully.   Can follow written and spoken instructions, has issues getting along with others and reports getting aggressive[.]").   Szymanski opined that Ippolito's report was not consistent with the other medical evidence insofar as it indicated that Plaintiff had marked limitations in regulating emotions and behavior, and offered the following opinion concerning Plaintiff's mental ability to work:

> Examiner [(Ippolito)] opines clmt has mild limitations with concentration and performing a task at a consistent pace[; that] Clmt has moderate limitations with using reason and judgment to make

work related decisions, interact adequately with supervisors, coworkers, and the public; and sustain an ordinary routine and regular attendance at work[; and that] Clmt has marked limitations with regulating emotions, controlling behavior, and maintaining well-being.   However, marked limitations are inconsistent with MER. Claimant appears appropriate for simple work with low contact at this time.

Tr. 1162.   Dr. Juriga adopted and signed off on Szymanski's proposed findings. Tr. 1163.[12]   Agency review psychologist L. Haus, Psy. D. ("Haus") also concurred with these findings. Tr. 201-219 (reconsideration determination).

On May 1, 2019, Zenoski reported that Plaintiff was still complaining of general poor health and fatigue, as well as depression and anxiety. Tr. 1240. However, Zenoski also reported "normal" mental status examination findings, including normal judgment, insight, mood and affect, as well as intact memory. Tr. 1241.

On June 21, 2019, Plaintiff went to the ER complaining that "multiple stressors" had caused a "marked increase in anxiety and depression" and that her medications were not working. Tr. 1606.   Plaintiff indicated feeling hopeless but

---

[12] Courts have accepted such indications as the medical opinion of the reviewing agency physician. *See, e.g., Stuart v. Colvin*, No. 13-CV-04552 SLT, 2014 WL 4954487, at *6 (E.D.N.Y. Sept. 30, 2014) ("Kessel reviewed the [electronic request for medical advice] form and provided his signature."); *Lackner v. Astrue*, No. 09-CV-00895 NAM, 2011 WL 2470496, at *6 (N.D.N.Y. May 26, 2011) ("Plaintiff argues that Dr. Wakeley's opinions were not entitled to any weight because she failed to sign her report. The Court disagrees. Dr. Wakeley received an "electronic request for medical advice" and typed the form she completed. Notably, nothing in the form was handwritten. Above a signature line at the end of the form, Dr. Wakeley typed her name, "Wakeley MD, C.," as well as the date, "1/10/07" (R. at 137)."), report and recommendation adopted, No. 1:09-CV-0895, 2011 WL 2457852 (N.D.N.Y. June 20, 2011); *Davidson v. Colvin*, No. CIV.A. 13-1136-KHV, 2015 WL 2451218, at *11 (D. Kan. May 21, 2015) ("The fact that an agency employee may have prepared the document does not show that Dr. Siemsen did not review it. To the contrary, the fact that Dr. Siemsen signed the document indicates that he adopted the statements contained therein.").

not suicidal. Tr. 1606.   Plaintiff stated that she had been "doing really well" with her mental health treatment up to that point, but that three days earlier her mother-in-law had invited a houseguest (female, presumably) to stay with them, which would have required the guest to share Plaintiff's bed. Tr. 1612.   Plaintiff felt distraught about this and that she had no say in the matter, and wanted to be removed from the home, which is why she went to the ER to be admitted on a voluntary basis. Tr. 1612 ("She feels she needs to be removed from the situation and that the problem is not her own.").   Plaintiff indicated that she and her husband lived with her mother-in-law and that her husband was gone most of the time due to his work schedule as a truck driver. Tr. 1613.   The attending doctor observed that Plaintiff appeared anxious and depressed but without psychosis, suicidal ideation or homicidal ideation. Tr. 1608.   A mental status exam performed a short time later showed normal results including euthymic mood and affect. Tr. 1614. Chart notes indicate that on June 23, 2019, Plaintiff reported that she "felt much better." Tr. 1621 ("She states overall she is feeling much better.   She denies suicidal ideation.   Her participation has been good.   She is sleeping and eating well.").   The following day Plaintiff similarly reported doing well, Tr. 1625, and the next day, June 25, 2019, she was discharged. Tr. 1629.   The discharge note indicated that Plaintiff had "a relatively rapid improvement" and that her mental status upon discharge was normal. Tr. 1630.

On October 4, 2019, after being in therapy for almost a year, Plaintiff told Lorenz that "[s]he ha[d] recently had a series of suppressed memories [of] being

17

raped at the age of 17 by her mom['s] then [boyfriend] and another friend of his in a flash back form." Tr. 1730; 1730.   Plaintiff reported being "in a state of arousal and agitation intermittently since" the flashbacks. Tr. 1730. Plaintiff told Lorenz that the "suppressed memories" of the rape had just recently surfaced and that she had not told anyone else about the incident. Tr. 1737.   Plaintiff also indicated that she and her husband had been fighting a lot, apparently because Plaintiff had contacted an old boyfriend through social media. Tr. 1737.

On October 11, 2019, Plaintiff told Lorenz that she had a difficult week due to recalling the suppressed memories of the rape. Tr. 1739.   Plaintiff reiterated to Lorenz that she had not previously told anyone else about the rape incident. Tr. 1739.   Plaintiff continued to complain about having to live with her mother-in-law, describing her as "vindictive," "self-centered" and "not to be trusted." Tr. 1739. Plaintiff indicated that she had injured her leg, and that her sister was coming to visit for a week to help care for her during her recovery. Tr. 1739.

On October 22, 2019, Rao saw Plaintiff for a medication management appointment lasting 17 minutes. Tr. 1743.   Plaintiff indicated that her "chief complaint" was pain in her knee, which she had injured in a fall after becoming entangled in her dog's leash. Tr. 1743.   Plaintiff, who was using crutches, indicated that the pain kept her from working in her garden, but that otherwise she was "staying busy and doing well." Tr. 1743.   Plaintiff indicated that one of her sisters from Indiana had come to stay at her house to help her following her knee injury. Tr. 1744.   Plaintiff noted that she continued to live with her husband, who

was only home on weekends, and with her mother-in-law. T. 1744.   Rao reported largely normal mental status exam findings, except that Plaintiff felt "really down because of ongoing struggle with her [knee] pain," although Rao noted that Plaintiff declined to take any type of pain medication. Tr. 1744.

On November 2, 2019, Plaintiff reported for her session with Lorenz quite upset about a billing issue with Clarity. Tr. 1752.   Lorenz indicated, however, that while Plaintiff had initially been agitated she "calmed down quickly." Tr. 1752. Plaintiff told Lorenz that she and her husband had just attended a Buffalo Bills football game which had been enjoyable even though Plaintiff had been using crutches. Tr. 1752.

On December 6, 2019, Plaintiff told Lorenz that she and her husband had traveled back to Indiana to celebrate Thanksgiving with family. Tr. 1760.   Plaintiff indicated that her mother had just been diagnosed with early alzheimer's disease, and that Plaintiff had therefore "gone into overdrive" and done all the cooking and cleaning. Tr. 1760.   Plaintiff also stated that there had been "drama" with various family members, including an argument with her neice's husband and her sister being arrested on a 19-year-old arrest warrant. Tr. 1760.   Plaintiff indicated that following her sister's arrest and remand to jail Plaintiff had gone "ballistic" and "called everyone in the local police and government that would listen" and given them "an earful." Tr. 1760.   Plaintiff also stated that she had been attending physical therapy sessions to rehabilitate her injured knee. Tr. 1760.

On December 27, 2019, Plaintiff told Lorenz that she had been experiencing

"usual family drama" but had gotten better about "setting boundaries." Tr. 1765. Lorenz reported that Plaintiff "ha[d] been able to set boundaries with family and [was] finding the strength to be able to function without her mother-in-law's help." Tr. 1765.   Plaintiff indicated that she hoped to receive an SSDI settlement that she would use to purchase a home for herself away from her mother-in-law, "with or without her husband." Tr. 1765.   Plaintiff told Lorenz that she and her husband were planning a vacation in Florida, and that she was looking forward to it because she was ready for a break. Tr. 1765.

On January 5, 2020, Rao saw Plaintiff for another medication management appointment lasting 17 minutes. Tr. 1777.   Plaintiff's "chief complaint" was that she was "having [stress related] headaches again." Tr. 1777, 1778.   Plaintiff again referenced the desire for her and her husband to move away from her mother-in-law. Tr. 1778.   Rao opined that Plaintiff had "terrible anxiety and very minimal skills to manage any kind of stress." Tr. 1777.   Rao indicated that Plaintiff was continuing to pursue therapy to help her develop such skills. Tr. 1777.   Rao stated that "once again" Plaintiff was "very tearful and crying, saying [that] any small thing stresses her out." Tr. 1777.   As an example of this, Plaintiff had told Rao that she became "extremely anxious" after finding out that Rao's regular nurse was away on vacation. Tr. 1777.   Rao again reported mostly normal mental status exam findings, except for "very tearful and extremely anxious" mood, which was "her usual presentation. Tr. 1778.   Rao indicated that Plaintiff was *not* having medication-related side effects. Tr. 1778.   Rao advised Plaintiff that in addition to

taking her medication she needed to continue therapy "to work on learning more skills to manage her anxiety and stress." Tr. 1779.

On January 11, 2020, Lorenz reported that Plaintiff had had a much better week and that the vacation to Florida had gone well. Tr. 96.   Plaintiff indicated that she and her husband had stayed with her husband's father and step-mother and that she had gotten along fine with them. Tr. 96.   Plaintiff indicated that she had spent the time mostly relaxing on the beach, which was not crowded.   Plaintiff indicated that it had been good to have a break from her mother-in-law and that she and her husband were making it a "priority" to find a new house away from the mother-in-law. Tr. 96.

On January 24, 2020, Plaintiff told Lorenz that her life was back to normal, but not good, in that she was continuing to have conflicts with her mother-in-law, whom she described as mentally ill and a hoarder. Tr. 106.   Plaintiff indicated that her husband did not recognize or acknowledge his mother's mental illness. Tr. 106. Plaintiff stated that she found ways to manage chores without her mother-in-law's help.   Plaintiff mentioned that her SSDI hearing was coming up and that her attorney had suggested that she might want to increase her medications to counteract any anxiety, but Plaintiff indicated that she did not want to do so, since she wanted the ALJ to witness her have a "meltdown" if one occurred. Tr. 106 ("She stated that if she has a meltdown the judge needs to see that.").   Plaintiff reiterated that if she received an SSDI "settlement" she hoped to use it to finance new living arrangements away from her mother-in-law. Tr. 106.

21

On January 31, 2020, Plaintiff told Lorenz that she was "holding her own" but becoming more anxious as the date of the SSDI hearing approached. Tr. 108. Plaintiff stated that she had always been a "go getter" who worked and supported herself over the years but had concluded that she needed SSDI benefits "even if only for [the] short term." Tr. 108-109.   Plaintiff stated, though, that she "still wanted to believe" that she would eventually "gain that full independence back." Tr. 109.   Plaintiff further noted that she and her husband had found a house that they both liked, and that she was "hoping for a larger back payment from SSDI and that would go towards the down payment" so that she could get "a sense of independence back and get away from her mother-in-law [    ] and put some space in the relationship." Tr. 109.

On February 3, 2020, Rao completed a "medical treating source statement" for Plaintiff. Tr. 1786-1788.   Rao's check-the-box report largely indicated that Plaintiff had "Poor/None" ability to perform most work-related functions.   More specifically, Rao stated that Plaintiff had a "good" ability to maintain attendance and be punctual, and a "fair" ability to sustain an ordinary routine, ask for assistance and be aware of normal hazards, but that she had "poor/none" ability to carry out short and simple instructions, maintain attention, work with others, make simple work-related decisions, accept instruction and supervision, get along with co-workers, and respond appropriately to changes in the work setting. Tr. 1786-1788.   Rao further stated that Plaintiff's condition had persisted since September 24, 2018.   Tr. 1788.   The report contained a section entitled

"explanation of your assessment," but Rao left that section blank. Tr. 1788.

On February 17, 2020, Plaintiff told Lorenz that her mother-in-law was continuing to manipulate and cause friction between Plaintiff and her husband. Tr. 112. Plaintiff also expressed frustration with her husband's work arrangement and pay, and expressed doubts about their relationship. Tr. 112. Plaintiff also expressed frustration that her husband had not pressured their auto mechanic to finish a long overdue repair job and that she had therefore "chewed out" the mechanic over the phone and threatened to sue him. Tr. 112 ("Jamie states she was loud and mean and scared the crap out of the shop owner and [her husband] as well."). Plaintiff also reiterated that she was hoping for an SSDI settlement to finance the purchase of a home. Tr. 112.

Also on February 17, 2020, Zenoski reported that Plaintiff was alert and oriented, with no anxiety or depression. Tr. 163 ("No anxiety, depression.").

On February 21, 2020, Plaintiff told Lorenz that she was continuing to have problems with her mother-in-law and husband, which she detailed. Tr. 114. Lorenz reported, however, that Plaintiff was succeeding in making changes in her relationships. Tr. 114 ("Jamie has done well to set boundaries with both [her husband's] family and her family. [S]he is getting better physically and mentally and she is determined not to lose ground."). Plaintiff reiterated that she hoped to receive an SSDI payment so that she could buy a house and "put some distance between" herself and her mother-in-law. Tr. 114.

On April 3, 2020, Plaintiff told Lorenz that she was "feeling better overall"

but that her anxiety "ramped up" prior to medical appointments. Tr. 127.   Plaintiff indicated that she had been actively working in her yard doing landscaping. Tr. 127 ("Jamie has spent the week outdoors and rolled the yard and is planning her planting.").   Plaintiff indicated that she was "struggling" with the mandated isolation required by the Covid-19 lockdown. Tr. 127.   Plaintiff mentioned that she had verbally "beaten up" a telephone customer service representative about her dish tv service and had succeeded in obtaining better service terms. Tr. 127-128.

On June 2, 2020, Lorenz noted, as part of an ongoing treatment recommendation, that Plaintiff had "chronic depression, anxiety, PTSD and OCD like symptoms" as well as a "long history in addictions." Tr. 147.   Lorenz stated that Plaintiff's "long term risk for lethality [(ie., suicide)] is moderate," with risk factors including a long history of physical, emotional and sexual abuse and current dysfunctional family relationships. Tr. 147.   Lorenz indicated that Plaintiff was "engaged and willing to seek treatment" but cautioned that her condition could deteriorate if she were to lose her "supports," namely, her reasons to live and her belief system which "does not support taking [one's] own life." Tr. 147.

On June 10, 2020, Zenoski reported that Plaintiff's anxiety and depression were "stable," though she was having continued problems living with her mother-in-law. Tr. 180 ("depression and anxiety – she feels stable but a lot going on in her life."); *see also, id.* (Plaintiff feeling conflicted because she wants to move out of house with mother-in-law but worries about who will take care of mother-in-law if she leaves.)

24

On February 28, 2020, (seventeen months after alleged onset date) a hearing was held before an Administrative Law Judge ("ALJ"), at which Plaintiff appeared with her attorney.   The ALJ took testimony from Plaintiff and from a vocational expert ("VE"). Plaintiff indicated that she slept 10 or 12 hours per night and then took a two-hour nap each day. Tr. 50.   Plaintiff indicated that she no longer drove a car because it caused her vertigo and headaches. Tr. 41 (However, as indicated above, Plaintiff still drove when necessary).   Plaintiff stated that she had difficulty with maintaining attention and concentration and making decisions, and that she did not have any friends, including family members. Tr. 55-56. Plaintiff told the ALJ that she had difficulty going into crowds. Tr. 56. (Although, as noted earlier the record indicates that she had enjoyed attending an NFL game and had flown to-and-from Florida with no difficulty).   Plaintiff indicated that she had panic attacks every day, for which she took medication that caused her to fall asleep for "a couple hours" each day. Tr. 58-59.   Plaintiff indicated that she had been unable to shower the day before the hearing because she had become afraid and "locked up" and unable to move. Tr. 60.

On April 28, 2020, the ALJ issued a decision finding that Plaintiff was not disabled at any time between the alleged onset date, September 24, 2018, and the date of the decision. Tr. 16-28.   Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity ("SGA") since the alleged onset date.   At step two, the ALJ found that Plaintiff had the following severe impairments: "asthma, obesity, major

depressive disorder, panic disorder, bipolar disorder, generalized anxiety disorder and PTSD." Tr. 18.   The ALJ observed, however, that Plaintiff's mental status examinations typically indicated that she was alert, oriented and in no distress, with adequate cognition and memory. Tr. 18-19.   At step three, the ALJ found that Plaintiff's impairments, including non-severe impairments, either singly or in combination did not meet or medically equal the severity of any listed impairment. Specifically with regard to Plaintiff's mental impairments, the ALJ found that such impairments did not meet either the "paragraph B criteria" or the "paragraph C criteria" for listings 12.04, 12.06 or 12.15. Tr. 20-21. As for the paragraph C criteria the ALJ stated:

> The undersigned has also considered whether the "paragraph C" criteria are satisfied.   In this case, the evidence fails to establish the presence of the "paragraph C" criteria.   There is no evidence of a serious and persistent condition that resulted in both (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder; and (2) marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life.

Tr. 21.

Prior to reaching the fourth step of the sequential evaluation, the ALJ found, in pertinent part,[13]  that Plaintiff had the following RFC:

> She is able to perform simple, routine and repetitive tasks but not at a production rate pace (e.g. assembly line work).   She is able to

---

[13]  Since Plaintiff's physical abilities are not at issue in this action the Court has omitted the portions of the RFC finding that do not pertain to Plaintiff's mental impairments.

perform simple work-related decisions.   She is able to occasionally interact with co-workers, supervisors and the public.

Tr. 21.   In making this RFC determination the ALJ began by listing the various symptoms that Plaintiff claimed to experience due to her mental impairments in both her pre-hearing submissions and in her hearing testimony. Tr. 22.   Those symptoms included having multiple panic attacks per day, having problems with memory and concentration, being unable top relate to people, not having friends, being unable to be in crowds, and being unable to go outside alone. Tr. 22.   The ALJ stated that such clams were not entirely consistent with the evidence or record. Tr. 22.

With regard to the medical evidence, the ALJ noted that while Plaintiff had received in-patient treatment for mental health complaints, in each instance she had quickly improved and been discharged. *See, e.g.*, Tr. 22, 23.   The ALJ further indicated that Plaintiff's mental health treatment notes showed general improvement and stability with medication and counseling, and no medication side effects, despite ongoing depression and anxiety that was often exacerbated by "situational stressors." [14]   Tr. 25 ("[T]he claimant has generally improved and stabilized with continued treatment, medication, and counseling.   The undersigned also notes that in spite of the claimant's allegations of numerous medication side effects, during treatment that claimant denied medication side

---

[14]   As already noted, these situational stressors most frequently involved Plaintiff's relationship with her live-in mother-in-law.

effects at numerous visits.").

The ALJ indicated that Plaintiff's mental health symptoms might prevent her from performing complex work requiring regular interaction with others, but not the type of work described in the RFC finding.   In this regard, the ALJ observed that Plaintiff's activities, such as managing funds, caring for her home and pets, interacting with family members, and traveling to distant states, were not as limited as one would expect based on her subjective complaints. Tr. 25 ("The evidence in total suggests a greater mental and social functional ability than alleged.").

As for the medical opinion evidence, the ALJ indicated that he found the opinions of Juriga, Haus and Ippolito persuasive, since they were consistent with the other evidence.   Additionally, the ALJ determined that Juriga's and Haus's opinions more persuasive than Ippolito's, since Ippolito's report was somewhat vague. Tr. 26.[15] The ALJ indicated that Rao's opinion was not persuasive for several reasons.   First, the ALJ indicated that Rao's opinion was expressed in a check-the-box format without explanation. (The reader will recall that Rao declined to fill in the explanation portion of the report).   The ALJ further noted that Rao had not seen Plaintiff for medication management nearly as often as Lorenz had seen Plaintiff for therapy, and that most of Lorenz's therapy notes indicated that Plaintiff had a stable mood and affect. Tr. 26 ("Dr. Rao does not see the claimant as much

---

[15] Plaintiff filed her claim for SSDI benefits after March 27, 2017, and accordingly the ALJ was required to evaluate the medical evidence pursuant to the Commissioner's "new" regulations relating to such claims. *See, e.g., Michael H. v. Saul,* No. 5:20-CV-417 (MAD), 2021 WL 2358257, at *3–4 (N.D.N.Y. June 9, 2021) (Setting forth new the standard).

as her counselors do, and as noted above, at most of the claimant's treatment visits, she has shown a stable mood and affect with ongoing treatment.   As such, Dr. Rao's assessment is inconsistent with the claimant's more frequent counseling notes.").   The ALJ also noted that Rao's opinion that Plaintiff had "poor to no ability" to perform many activities "such as even being unable to understand simple instructions, make simple decisions, or get along with others without behavioral extremes" was "inconsistent with the claimant's ability to cook, clean, take care of her dogs, shop, and travel[.]" Tr. 26.

At the fourth step of the sequential evaluation, the ALJ found that Plaintiff could perform her past relevant work as a bean-canning inspector ("canning and preserving inspector") and was therefore not disabled.   The ALJ accordingly did not proceed to the fifth step.   Plaintiff appealed the determination of non-disability, but on July 17, 2020, the Appeals Council declined to review the ALJ's decision. Tr. 1.

In this action, Plaintiff contends that the Commissioner's decision denying benefits must be reversed for the following reasons: 1) The ALJ's finding at Step 3, that Plaintiff's mental health impairments did not meet or medically equal a listed impairment, is unsupported by substantial evidence, since the ALJ incorrectly found, when considering the paragraph C criteria, that Plaintiff did not live within a highly-structured setting; 2) the ALJ's RFC finding is erroneous and unsupported by substantial evidence since the opinions of Juriga, Haus and Ippolito were "stale" insofar as they were rendered before Plaintiff's June 2019 hospitalization and

before Plaintiff recalled her suppressed memory of being raped by her mother's boyfriend, and since Rao's opinion was better-supported in the record; and 3) the ALJ failed to properly evaluate Plaintiff's subjective symptoms and mischaracterized the evidence of record.

Defendant disputes Plaintiff's arguments and maintains that the ALJ's decision is free of reversible legal error and supported by substantial evidence.

The Court has carefully reviewed and considered the parties' submissions.

DISCUSSION

The ALJ's Analysis of the Paragraph C Criteria at Step Three
of the Sequential Evaluation

Plaintiff alleges that the ALJ erred at the third step of the sequential evaluation when considering whether her mental impairments met or medically equaled a listed impairment.   Specifically, Plaintiff maintains that the ALJ erred when considering the "paragraph C criteria" by erroneously finding that she did not have a serious and persistent condition that resulted in a highly structured setting that was ongoing and that diminished the symptoms and signs of her mental disorder.   Plaintiff alleges that such finding was erroneous because she does, in fact, live within such a highly structured setting.   Plaintiff contends, for example, that because of her mental health symptoms she remains isolated in her home, rarely goes out, has given up driving and is afraid to be alone, and that such "evidence indicates that [she] is provided a highly structured and supportive setting

30

by her husband and mother-in-law, without which she would not appear to function adequately."[16]   Plaintiff further indicates that the evidence shows she is unable to adequately adapt or function outside of this structured environment.

Defendant responds that the ALJ properly found that Plaintiff's mental impairments did not meet or medically equal a listed impairment and properly assessed all the relevant criteria, including the paragraph C criteria.   Defendant further indicates that the record shows Plaintiff was able to function adequately even outside of her alleged usual highly-structured living environment, such as when she traveled to Florida and Indiana and shopped for a new home.

The Court finds that Plaintiff's argument lacks merit and that the ALJ properly considered the paragraph C criteria.   In this regard,

> [t]o satisfy Paragraph C, the claimant must have a two-year documented history of the disorder with evidence of *both* (1) medical treatment, mental health therapy, psychosocial support, *or* a highly structured setting that is ongoing and diminishes the symptoms or signs of the disorder; *and* (2) only marginal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's life. 20 C.F.R. Pt. 404, Subpart P, App. 1 § 12.00(G)(2).

*Marcano v. Comm'r of Soc. Sec.*, No. 20CV4230JPORWL, 2021 WL 5315703, at *14 (S.D.N.Y. Nov. 16, 2021) (emphasis added), report and recommendation adopted, No. 20-CV-4230 (JPO), 2022 WL 253083 (S.D.N.Y. Jan. 26, 2022).   As the foregoing quote indicates, a plaintiff may satisfy Paragraph C1 by showing

---

[16] ECF No. 14-1 at pp. 26-27.

either "medical treatment, mental health therapy, psychosocial support, **or** a highly structured setting that is ongoing and diminishes the symptoms or signs of the disorder." (emphasis added).

In the instant case, the Court notes initially that the ALJ never specifically indicated that Plaintiff's home environment was *not* a highly-structured setting that diminished the symptoms of her mental impairments, contrary to what Plaintiff alleges.   Instead, the ALJ simply found that Plaintiff's mental impairments did not meet the requirements of both paragraphs C1 & C2.   In the context of this case, where it is undisputed that Plaintiff's mental health condition resulted in her receiving ongoing "mental health therapy," thereby satisfying paragraph C1 without regard to any highly-structured setting, it appears the ALJ found that Plaintiff did not satisfy paragraph C2 since she had more than "minimal capacity to adapt to changes in [her] environment or to demands that [were] not already part of [her] daily life."   For example, the ALJ noted elsewhere in his discussion at step three that

> with ongoing treatment, the claimant has generally stabilized, and the claimant has denied medication side effects at most treatment visits.   The claimant has also admitted that she is independently able to cook, clean, and go shopping, along with the ability to manage funds, take care of her dogs and interact with others on the telephone.   *Further, despite the claimant's allegations of panic and trouble leaving her home, the record documents the claimant traveling to Indiana for a holiday and to Florida for a vacation trip.*

Tr. 20-21 (emphasis added).   In other words, the ALJ found that Plaintiff failed to satisfy C2, not C1.

Moreover, the ALJ's finding that Plaintiff did not satisfy the C2 criteria is supported by substantial evidence in the record showing that Plaintiff was able to adapt to changes and demands that were not already part of her daily life.[17]   For example, Plaintiff was able to: travel to Indiana and put on Thanksgiving for her entire family after learning that her mother was suffering from Alheimer's disease; travel to Florida by plane for vacation and stay with her husband's father and step-mother without incident; participate in physical therapy for her knee; look for a new home; and attend an NFL football game while on crutches.   Plaintiff points out that there is other evidence of record indicating that she does *not* adapt well to changes, such as evidence that she became distraught when she went to a mental health appointment and Dr. Rao's regular nurse was absent.[18]   However, as indicated above, when applying the substantial evidence standard the Court is not permitted to re-weigh the evidence.

Additionally, even assuming *arguendo* that the ALJ incorrectly found that Plaintiff did not live in a highly structured setting that diminished the symptoms of her mental disorder, such finding would not have prejudiced Plaintiff, since she still otherwise met the requirement of paragraph C1 by virtue of receiving "medical treatment," "mental health therapy" and/or "psychosocial supports." *See, Patrick v.*

---

[17] *See*, Tr. 25 ("[D]espite the claimant's allegations of panic and trouble leaving home, the record documents the claimant traveling to Indiana for a holiday and to Florida for a vacation trip.   The evidence in total suggests a greater mental and social functional ability than alleged.").

[18] *See, e.g.*, ECF No. 14-1 at p. 27 ("[W]hen a new nurse filled in for the one Plaintiff normally saw at Dr. Rao's office, Plaintiff immediately had trouble focusing and became extremely anxious.").

*Comm'r of Soc. Sec.*, No. 3:19-CV-1697 (SRU), 2021 WL 1100177, at *9 (D. Conn. Mar. 23, 2021) ("The criterion in C1 is satisfied when the evidence shows that you rely, on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), **or** a highly structured setting(s), to diminish the symptoms and signs of your mental disorder." 20 C.F.R. Pt. 404, Subpt. P, App. 1 (listing 12.00G2b).") (emphasis added).

Plaintiff's motion is therefore denied insofar as it is based on her contention that the ALJ's finding concerning the Paragraph C criteria is unsupported by substantial evidence.

### The ALJ's Evaluation of Medical Opinion Evidence

Plaintiff next alleges that the ALJ's RFC determination was unsupported by substantial evidence insofar as it rested on the opinions of Juriga, Haus and Ippolito, since those opinions were rendered prior to October 2019, when Plaintiff told Lorenz that "[s]he ha[d] recently had a series of suppressed memories [of] being raped at the age of 17 by her mom['s] then [boyfriend] and another friend of his in a flash back form." Tr. 1730; 1730.   Plaintiff contends that her mental condition deteriorated thereafter, and that the opinions of Juriga, Haus and Ippolito did not account for that fact, while Rao's opinion did.   Plaintiff therefore maintains that the opinions of Juriga, Haus and Ippolito were "stale."   Plaintiff alternatively maintains that the ALJ erred insofar as he found the opinions of Juriga, Haus and Ippolito more persuasive than Rao's opinion, since Rao's opinion was consistent

with other evidence of record and since Rao's treating relationship with Plaintiff provided him with a better basis for an opinion.

The Court does not find Plaintiff's "staleness" argument persuasive for several reasons.   To begin with, the factual premise of the argument appears incorrect in a few respects.   For example, Plaintiff contends that she only recalled the rape in 2018, and that Lorenz was the first person she ever told about it.[19] However, that assertion is inconsistent with the medical record which indicates that Plaintiff discussed the same incident with Dr. Greiner in 2014 when she was still living in Indiana. Tr. 1450 ("Her mom 'went on a wild streak and had lots of boyfriends, one of whom abused Jamie."); 1455 ("She also reported that she was sexually abused by former boyfriends and strangers.").   It strongly appears to the Court that the incident that plaintiff related to Greiner about her mother's boyfriend abusing her and the incident that Plaintiff related to Lorenz about being raped by her mother's boyfriend are the same incident.   Plaintiff had also discussed *other* rapes with Greiner. Tr. 1446 ("She has previously been raped when she was dating when she was under the influence of Ambien sleeping pills.").

Apart from that, and more importantly, the Court does not agree that Plaintiff's condition deteriorated following her alleged recovery of the suppressed memory of the rape by her mother's boyfriend. For example, as proof that Plaintiff's

---

[19] By emphasizing the "suddenly recalled" nature of this previously-suppressed memory of trauma, Plaintiff implies that the memory had a particularly devastating impact on her functioning at that time.

mental health "deteriorated" after she recalled the memory of the rape, Plaintiff asserts that she needed to see Rao more frequently: "Deterioration of Plaintiff's mental functioning is further evidenced by Plaintiff's hearing testimony that although she previously saw Dr. Rao once per month, she was now seeing him once every three weeks." ECF No. 14-1 at p. 22.   In fact, however, Plaintiff actually testified that she saw Rao *less often,* and reduced the frequency of her visits from once every month to once every three *months*. See, Tr. 53 ("We started out about once a month, and now I'm at once every three months.").

Further, there is no indication that Rao was even aware of the rape incident involving Plaintiff's mother's boyfriend, or, if he was, that it affected his opinion concerning Plaintiff's mental ability to work.   In that regard, Plaintiff met with Rao on October 18, 2019, just two weeks after she told Lorenz about the rape. Tr. 1743. However, there is no indication that Plaintiff mentioned the rape to Rao.   Instead, Plaintiff reportedly told Rao on that occasion, during their 17-minute office visit, that her chief complaint was knee pain, and that her sister had recently visited her. Tr. 1743-1744.   Nor did Rao otherwise mention the rape in subsequent office notes or in his RFC report.   Plaintiff nevertheless essentially argues that the Court should *assume* that Rao took the rape into account when making his RFC opinion and that his opinion was therefore necessarily more up-to-date and persuasive than the opinions of Juriga, Haus and Ippolito.   However, the Court declines to do so.

Moreover, the Court does not agree that the opinions of Juriga, Haus and Ippolito were stale, since, for the reasons already discussed, the record does not indicate that Plaintiff's condition worsened appreciably after Juriga, Haus and Ippolito rendered their opinions.   "[R]eversal may be appropriate where the Commissioner's decision to deny benefits rests on a consultative opinion that was 'stale' because it was rendered on an incomplete record, particularly where subsequent developments in the medical evidence cast doubt on the accuracy of the opinion[.]" *Johnson v. Comm'r of Soc. Sec.*, No. 1:19-CV-0706 CJS, 2020 WL 5104550, at *8 (W.D.N.Y. Aug. 31, 2020).   Here, Plaintiff asserts that the opinions of Juriga, Haus and Ippolito were stale in part because they were rendered before Plaintiff was admitted to the hospital in June 2019.   However, that hospitalization is not evidence that Plaintiff's condition was "deteriorating," contrary to what Plaintiff maintains.   Rather, as discussed earlier, Plaintiff checked herself into the hospital primarily because she was upset about a particular incident in which her mother-in-law invited a houseguest to stay with them without asking Plaintiff's permission.   Plaintiff expressly told hospital staff that she had sought hospital admission because she wanted to be "removed" from the home because of that situation. Tr. 1612 ("She feels she needs to be removed from the situation and that the problem is not her own.").   Moreover, after being admitted, Plaintiff rapidly improved and was discharged within a few days.   The hospital admission thus arguably gave Plaintiff exactly what she requested, which was a few days away from her mother-in-law and the mother-in-law's houseguest.   However, as the ALJ

37

explained, the admission did not indicate that Plaintiff's condition was worsening. For example, although upon admission the attending doctor observed that Plaintiff appeared anxious and depressed (but without psychosis, suicidal ideation or homicidal ideation), a mental status exam performed a short time later showed normal results including euthymic mood and affect. Tr. 1608, 1614.   Moreover, Plaintiff indicated that up until three days prior to her admission (when she had the dispute with her mother-in-law) she had been doing "really well." Tr. 1612.   In sum, the suggestion by Plaintiff that such hospital admission was indicative of a general worsening of her condition that took place after Juriga, Haus and Ippolito rendered their opinions is not substantiated by the record.

Similarly   unsubstantiated   is   Plaintiff's   contention   that   her   condition deteriorated even further after October 2019, that is, after she had recalled the rape by her mother's boyfriend.   Rather, as summarized earlier, and as the ALJ recognized, the subsequent treatment notes from Lorenz, Rao and Zenoski indicate that Plaintiff's condition either improved or remained the same. Tr. 25 ("[T]he claimant has generally improved and stabilized[.]").

Plaintiff also contends that the ALJ should not have found Rao's opinion unpersuasive because Rao did not explain the basis for his opinions in the report itself.   Plaintiff maintains, rather, that the ALJ should have considered Rao's office notes as providing an explanation for the opinion.   However, the Court has reviewed Rao's office notes, which are not extensive, and does not find that the

notes really support his opinion that Plaintiff was essentially incapable of almost every mental aspect of work.   Moreover, the Court agrees with the ALJ that Rao's opinion is also not consistent with much of the other medical evidence or with Plaintiff's demonstrated ability to function in her daily life.

Finally, the Court does not agree that the ALJ erred in finding the opinions of non-treating (Ippolito) and non-examining (Juriga, Haus) sources more persuasive than Rao's treating opinion, since the ALJ gave good reasons for doing so. *See, e.g., Brenda H. v. Comm'r of Soc. Sec.*, No. 20-CV-01025, 2022 WL 125820, at *5 (W.D.N.Y. Jan. 13, 2022) ("Plaintiff argues the ALJ should not have relied on the opinion of Dr. Fuess but rather the opinions from treating sources at CCDMH.   However, the ALJ was permitted to give greater weight to the opinion of the medical expert despite the doctor not personally examining the plaintiff.   . . .   When an opinion is unsupported, or when it is inconsistent with other substantial evidence, the ALJ is not required to afford deference to that opinion and may use his or her discretion in weighing the medical evidence as a whole[.]") (citations omitted).

<u>The ALJ's Evaluation of Plaintiff's Subjective Complaints</u>

Lastly, Plaintiff contends that the ALJ failed to properly evaluate her subjective complaints and mischaracterized the record.   For example, Plaintiff states that the ALJ indicated that she was able to go shopping independently, while Plaintiff indicated in a function report that she only went shopping with her

husband, and that even then she needed to hold onto her husband's shirt. Additionally, the ALJ noted that Plaintiff was able to cook and clean, but failed to credit Plaintiff's assertion that she "gets mad and aggressive" when she performs chores.   In sum, Plaintiff alleges that the ALJ assigned exaggerated importance to some of her activities, such as her trips to Indiana and Florida, which are not really indicative of an ability to work on a full-time basis, and in doing so improperly discredited her. *See*, ECF No. 14-1 at p. 30 (Asserting that the ALJ "mischaracterized the evidence in an effort to assert that Plaintiff was not truthful or not as limited as alleged.").   Alternatively, Plaintiff maintains that the ALJ should have explored these activities more fully with Plaintiff before relying on them to rule against her.

However, the Court disagrees.   It is appropriate for an ALJ to point out inconsistencies in a claimant's statements when evaluating the claimant's credibility, and in the Court's view the ALJ did not mischaracterize the evidence when evaluating Plaintiff's credibility about her subjective complaints. *See*, ALJ's Decision, Tr. 22-25.   For example, it was not improper for the ALJ to consider Plaintiff's trips to Indiana and Florida when evaluating her credibility, since those activities were inconsistent with her claim that her mental impairments prevented her from leaving home for fear of dying and from interacting appropriately with

other people.[20]  Tr. 25.   Consequently, Plaintiff's argument on this point also lacks merit.

CONCLUSION

For the reasons discussed above, Plaintiff's motion for judgment on the pleadings (ECF No. 14) is denied and Defendant's cross-motion for the same relief (ECF No. 20) is granted.   The Clerk of the Court is directed to enter judgment for Defendant and to close this action.

So Ordered.

Dated: Rochester, New York
       March 14, 2022

ENTER:

CHARLES J. SIRAGUSA
United States District Judge

---

[20]  *See, e.g.*, Tr. 334 ("I don't go outside, everything spins and I start panicking."); *see also, id.* ("I don't go [outside] because [I'm afraid] I am going to die or not make it back home.").